748 A.2d 515

IN THE MATTER OF THE ADOPTION
OF A CHILD BY W.P. AND M.P.

Argued October 26, 1999—Decided April 6, 2000.

*James W. Miskowski and Harriet Dinegar Milks,* argued the cause for appellants W.P. and M.P., (*MacFall, Riedl & Miskowski,* attorneys).

*Toby Solomon,* argued the cause for respondents K.S. and M.J.S., (*Ms. Solomon,* attorney; *Ms. Solomon* and *Kathleen Morehouse,* on the briefs).

*Ann Marie Seaton,* Senior Deputy Attorney General, argued the cause for *amicus curiae* Division of Youth and Family Services (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue in this appeal is whether pursuant to *N.J.S.A.* 9:2–7.1 (the "Grandparent Visitation Statute"), grandparental visitation by a child's biological grandparents can be enforced over the objections of nonrelative adoptive parents. To resolve that issue, we must determine whether an award of visitation under the Grandparent Visitation Statute conflicts with the public policy of the New Jersey Adoption Act, *N.J.S.A.* 9:3–37 to –56 (the "Adoption Act"), when a child is adopted by a nonrelative intact family.

I.

V was born on August 11, 1994, to unmarried parents JH and TS. When V was six months old, JH placed her with nonrelatives WP and MP (the "adoptive parents," or "petitioners"). TS, the child's biological father, was incarcerated at that time. JH executed a consent for V's adoption and her parental rights were terminated.

The prospective adoptive parents filed a complaint for adoption. TS filed a formal answer objecting to the adoption on May 2, 1995. His parents, KS and MS (the "grandparents" or "respondents"), filed an application to intervene to obtain custody of V, to permit grandparental visitation, and to permit them to file a complaint for the adoption of V. The court granted the grandparents the right to intervene on the issues of grandparent visitation and custody if the adoption was not granted. However, their application to adopt was denied. In July 1995, TS was released from prison. He resided with his parents and worked for his father. On September 15, 1995, TS was granted visitation rights, and an order was entered allowing his parents to accompany him during his visitations. The order later was amended to make the grandparents' presence at TS's visitations mandatory. In January 1996, TS was arrested again, this time for possession and theft of handguns from his father's home. As a result of that action, TS's parents obtained a Final Restraining Order against him under the Domestic Violence Law.

Ultimately, TS's parental rights were terminated by court order over his objection. TS's appeal from that order was denied by the Appellate Division. *In re Adoption of a Child by W.P. and M.P.,* 308 *N.J.Super.* 376, 387, 706 *A.*2d 198 (App.Div.1998). The panel found that the record supported the court's conclusion that TS was unfit to act in a parental role and that continuation of TS's parental relationship would place V in substantial jeopardy. It noted TS's "chronic addiction to drugs," that he "has lived a life of crime," and that his "life has been punctuated by lengthy periods of incarceration." *Id.* at 386, 706 *A.*2d 198. It further observed, "TS's volatile relationship *with his parents* would place him in conflict concerning issues of child care, and thus *their ability* to assist in raising [V] would inevitably be subverted." *Id.* at 387, 706 *A.*2d 198 (emphasis added).

An adoption hearing was held in March 1998. By order dated April 1, 1998, the court directed that visitation by the grandparents on the third Sunday of every month was to continue. The

order also directed the adoptive parents and the grandparents to submit briefs on whether visitation should continue following the final order of adoption.

On April, 1, 1998, the trial court entered a Final Judgment of Adoption that provided in part:

3. The entry of this Judgment of Adoption shall terminate all relationships between the child and the birth mother, [JH], and putative father, [TS], as well as all rights, duties, and obligations of any person founded on those relationships, including the rights of inheritance under the laws of intestacy of the State of New Jersey except for any rights which may have vested prior to the entry of this judgment; and

4. The entry of this Judgment shall establish the same relationships, rights, duties, and obligations between the child and the adopting parents as if the child was born to the adopting parents in lawful marriage, including all rights of inheritance under the laws of intestacy.

Subsequently, in an unpublished opinion, the trial court found that the Grandparent Visitation Statute was constitutional even as applied to "intact" families. The court also held that the Grandparent Visitation Statute and the Adoption Act were not inherently in conflict. Instead, the court found that when parental rights have been terminated, the statutory scheme required an assessment of continued grandparental visitation on a case-by-case basis, with the best interests of the child being the determining factor.

Given the existing relationship between the grandparents and V, the trial court held that there should be a hearing to afford the grandparents an opportunity to demonstrate that continued visitation will be in V's best interest pursuant to the factors enumerated in the Grandparent Visitation Statute. On October 29, 1998, the court entered an order continuing the ongoing visitation and scheduling a hearing for December 3, 1998, on the issue of what grandparental visitation, if any, should be ordered.

The adoptive parents filed a motion for leave to appeal that order, which the Appellate Division granted. In an unpublished opinion, the panel concluded that the interlocutory appeal had been improvidently granted. The panel determined that a ruling on the interplay between the Grandparent Visitation Statute and the Adoption Act would benefit from the best interests hearing

called for by the trial court. Nonetheless, the Appellate Division offered numerous observations and tentative conclusions. Among them was the court's conclusion that the Adoption Act implicitly contemplates rights of post-adoption visitation by the biological family members.

We granted the adoptive parents' motion for leave to file within time and their motion for leave to appeal. 161 *N.J.* 328, 736 *A.*2d 522 (1999).

## II.

■ We view this appeal as a question of statutory interpretation of the Grandparent Visitation Statute and the Adoption Act, as applied to the rights of biological grandparents who seek visitation over the objections of nonrelative adoptive parents following the termination of the parental rights of the child's biological parents, either by consent or by court order. We conclude that such cases present an inherent conflict between the two statutes and find that the overriding public policy and statutory law regarding adoptions preclude the application of the Grandparent Visitation Statute when the child is adopted by intact, nonrelative adoptive parents. Because we decide this case on statutory grounds, we do not address the constitutional argument raised by the parties.

### A. *The Grandparent Visitation Statute*

In 1972, the New Jersey Legislature enacted its first version of the Grandparent Visitation Statute. *N.J.S.A.* 9:2–7.1 (*L.* 1971, *c.* 420, § 1, effective Feb. 1, 1972). The Visitation Statute, amended in 1973, afforded standing to grandparents to seek visitation only when "either or both of the parents of a minor child ... is or are deceased, or divorced or living separate and apart in different habitats...." *N.J.S.A.* 9:2–7.1 (as amended by *L.* 1973, *c.* 100, § 1). The Statute was subsequently amended again in 1987 to allow siblings to apply for visitation with the child. *N.J.S.A.* 9:2–7.1 (as amended by *L.* 1987, *c.* 363, § 2). Thus, prior to 1993,

"intact" families (those not disrupted by death or divorce) were not subject to statutory visitation rights of grandparents.

In 1993, *N.J.S.A.* 9:2–7.1, was amended to provide:

a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.

b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:

(1) The relationship between the child and the applicant;

(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;

(3) The time which has elapsed since the child last had contact with the applicant;

(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;

(6) The good faith of the applicant in filing the application;

(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and

(8) Any other factor relevant to the best interests of the child.

c. With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[*N.J.S.A.* 9:2–7.1 (as amended by *L.* 1993, *c.* 161, § 1 (effective June 29, 1993)).]

The new statute expanded the scope of grandparents' visitation rights and removed the requirement that the birth parents be deceased or divorced. The amended Grandparent Visitation Statute became effective June 29, 1993.

B. *N.J.S.A. 9:3–50 of the Adoption Act*

Toward the end of 1993, the Legislature amended *N.J.S.A.* 9:3–50 of the Adoption Act, entitled "Effect of adoption; relationships of parent and child; rights of inheritance," to provide:

14.a. (Deleted by amendment, P.L.1993, c. 345).

b. The entry of a judgment of adoption shall establish the same relationships, rights, and responsibilities between the child and the adopting parent as if the child were born to the adopting parent in lawful wedlock. For good cause, the court may direct the entry of judgment nunc pro tunc as of the date the action was

instituted. In applying the intestate laws of this State, an adopted child shall have the same rights of inheritance as if born to the adopting parent in lawful wedlock.

c. The entry of a judgment of adoption shall:

(1) terminate all parental rights and responsibilities of the parent towards the adoptive child except for a parent who is the spouse of the petitioner and except those rights that have vested prior to entry of the judgment of adoption;

(2) terminate all rights of inheritance under intestacy from or through the parent unless that parent is the spouse of the petitioner or that parent or other relative had died prior to the judgment of adoption; and

(3) terminate all rights of inheritance under intestacy from or through the child which existed prior to the adoption.

d. The court may order counseling for the adopting parents.

[N.J.S.A. 9:3–50 (as amended by L. 1993, c. 345, § 13, (effective April 27, 1994)).]

In revising N.J.S.A. 9:3–50, the Legislature deleted language appearing to terminate, in the adoption setting, the rights, duties and obligations of any person "founded upon" a relationship between the child and the biological parents. That amended statute became effective on April 27, 1994.

The grandparents assert that the Legislature, in revising the Adoption Act in 1993, intended to harmonize the Adoption Act with the Visitation Statute, enacted earlier in the same year. However, an examination of the legislative history of the two statutes reveals that the Legislature did not revise the Adoption Act to conform it, or harmonize it, with the Grandparent Visitation Statute, but amended the Adoption Act to facilitate adoptions.

C. *Legislative History of the Grandparent Visitation Statute*

On May 20, 1993, the General Assembly gave final approval to the Grandparent Visitation Statute. The bill was signed into law by Governor Florio on June 29, 1993, and became effective that same day. As previously stated, the new law eliminated the requirement that a child's parents be deceased, divorced or separated in order for a grandparent to apply for visitation rights. Instead, the statute provides that "a grandparent or any sibling of a child residing in this State" may apply for visitation, and it instructs the Superior Court to consider eight enumerated factors when determining whether the grant of such visitation is in the best interests of the child.

In its original form, the bill did not enumerate factors, requiring only that visitation be in the best interests of the child, with no guidance to the courts. In an apparent response to concerns that it constituted "a gross invasion of the .sanctity and privacy of the family unit," the bill was amended, setting forth the eight factors as a way of limiting the intrusive elements of the act. *See* Letter from Cary B. Cheifetz, Esq., Skoloff & Wolfe, to Gov. Jim Florio (Dec. 22, 1992) (enclosing proposed bill setting forth specific criteria that protect child's best interests).

A precursor to the current statute Assembly Bill No. 1475 was prefiled for introduction in the 1990 session. That bill expressly would have required that the court consider the objections of a parent to an application for visitation by that parent's parent (i.e., the child's grandparent). *See* Assembly Bill No. 1475, Prefiled for Introduction in the 1990 Session. According to the bill statement accompanying Bill No. 1475, the purpose of that provision was to "ensure that the court does not grant visitation to a parent's *own blood* relatives without considering whether the parent may object to such visitation." *Id.* at 2 (emphasis added). Although that provision was not enacted in the final bill, it suggests that the Legislature believed that parental autonomy should be afforded deference. Moreover, we observe that the statement was written in terms of "a parent's own blood relatives." That suggests that, at least in its earlier form, the Grandparent Visitation Statute was not intended to apply to a nonrelative adoption.

D. *Legislative History of the Adoption Act*

On December 16, 1993, almost 7 months after it enacted the Grandparent Visitation Statute, the Assembly gave final approval to Assembly Bill No. 1418/Senate Bill No. 685. That enactment revised and updated New Jersey's Adoption Act. The revisions, many in number, represented the first set of comprehensive changes to the adoption laws in nearly 14 years. The amendatory act contained twenty-three separate sections including revised *N.J.S.A.* 9:3–50.

The legislative history reveals that section 18 of the Adoption Act was the most controversial of all the revisions. That section, now found at *N.J.S.A.* 9:3–39.1, permits the use of intermediaries in non-agency settings to facilitate private adoptions. The passed-bill memorandum from Chief Counsel Scott Weiner to Governor Jim Florio summarized the amendatory sections of the bill without reference to the Grandparent Visitation Statute. *See* Memorandum from Scott A. Weiner, Chief Counsel, to Gov. Jim Florio (Dec. 21, 1993) (summarizing amendatory sections of Adoption Act).

The legislative history reveals that the amendments to *N.J.S.A.* 9:3–50 were a small part of a larger package of revisions to the adoption laws, the first set of such revisions in early 14 years. Typically, the newspaper articles reported that:

New Jersey's adoption laws would be revised with the aim of providing more options for prospective adoptive parents, including allowing the use of unpaid intermediaries to arrange adoptions, ...

[Tom Johnson, *Bill Voted to Update Adoption Laws as an Aid to Prospective Parents, Newark Star Ledger,* Feb. 2, 1993.]

Another article reported:

State lawmakers on Thursday approved a measure that revamps New Jersey's adoption laws to legalize private adoptions and allow unpaid intermediaries to arrange adoptions.

[Dunston McNichol, *Adoption Law Revision Advances, Bergen Record,* Dec. 17, 1993.]

*See also* Letter from Nicholas R. Scalera, Director, Division of Youth and Family Services of New Jersey Department of Human Services, to Emery J. Ungrady, Jr., New Jersey Senate (June 8, 1993) (questioning the advisability of intermediary involvement, and continuing recommendation that adoption be authorized only by approved agencies); letter from Thomas R. Curtin, New Jersey State Bar Association President, to Gov. Jim Florio (Dec. 23, 1993) (supporting bill because it makes adoption easier in New Jersey and clarifies current adoption laws).

Nowhere in the available documents pertaining to the Adoption Act is there a specific reference to the issue of grandparent visitation. The legislative history does contain some references

addressing the standards by which a parent may object to termination of parental rights, but not to grandparent visitation. Indeed, *N.J.S.A.* 9:3–50, including its very heading, "rights of inheritance," suggests that the Legislature was concerned with rights of inheritance and other issues, not grandparental visitation rights.

The absence of a discussion of grandparent visitation indicates that the Legislature did not revise the Adoption Act to harmonize it with the Grandparent Visitation Statute. That is further evidenced by the passage of time—nearly 7 months—between the two enactments. If the Legislature had wanted to harmonize the Grandparent Visitation Statute with the Adoption Act, it could have done so expressly at the time it revised the latter act.

Based on an examination of the legislative history of the Grandparent Visitation Statute and the Adoption Act, we find that the Legislature did not intend to harmonize or conform the two statutes. The two statutes are separate. Moreover, we believe that the statute that permits visitation rights of parents of the biological parents of a child adopted by intact nonrelative adoptive parents is in conflict with the provisions of the Adoption Act. An examination of the statutory scheme of the Adoption Act further supports that conclusion.

E. *Statutory Scheme of the Adoption Act*

■ It is a well-established principle that "[i]n discerning [the Legislature's] intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part," *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 234, 708 A.2d 401 (1998)(quoting *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 129, 527 A.2d 1368 (1987)). The statutory scheme of the Adoption Act emphasizes the complete termination of the biological parents' rights, thus having the logical effect of terminating a biological grandparent's right to visitation. We also observe that the confidentiality of the entire adoption procedure also supports the conclusion that the Adoption Act bars the

continued visitation of the biological grandparent of a child adopted by nonrelative adoptive parents.

*N.J.S.A.* 9:3-38(f)—defines parent to include "a parent or parents by adoption." *N.J.S.A.* 9:3-41(a) provides in part that:

Prior to the execution of the surrender, the approved agency shall, directly or through its agent, inform the person executing the surrender that the instrument is a surrender of parental rights by the signatory *and means the permanent end of the relationship and all contact between the parent and child.*

[*N.J.S.A.* 9:3-41(a) (emphasis added).]

*N.J.S.A.* 9:3-41.1(a) provides in pertinent part that an approved agent

shall provide a prospective parent with all available information, *other than information which would identify or permit the identification of the birth parent of the child,* ...

[*N.J.S.A.* 9:3-41.1(a) (emphasis added).]

*N.J.S.A.* 9:3-51 was amended to provide that all records of judgment of adoption:

*shall be sealed and thereafter shall be made accessible only by court order.*

[*N.J.S.A.* 9:3-51 (emphasis added).]

*N.J.S.A.* 9:3-52(a) provides that:

[a]ll records of proceedings relating to adoption, including the complaint, judgment and all petitions, affidavits, testimony reports, briefs, orders and other relevant documents, shall be *filed under seal by the clerk of the court and shall at no time be open to inspection or copying unless the court, upon good cause shown, shall otherwise order.*

[*N.J.S.A.* 9:3-52(a)(emphasis added).]

As the above-cited provisions of the Adoption Act reveal, the traditional adoption process is characterized by closed and confidential proceedings. Once the adoption is final, the records are sealed, and can be opened for inspection only by court order. All legal ties of the child to its natural parents are completely and permanently severed. The child becomes the child of the adoptive parents and part of their extended family. The intent of the Legislature is to promote the creation of a new family unit without fear of interference from the natural parents. *In re Adoption of a Child by D.M.H.,* 135 *N.J.* 473, 491, 641 *A.2d* 235 (1994), *cert. denied. sub nom. Hollingshead v. Hoxworth,* 513 *U.S.* 967, 115

*S.Ct.* 433, 130 *L.Ed.*2d 345 (1994). That intent did not change upon the enactment of the 1993 amendments to the Adoption Act.

No New Jersey court has directly addressed the issue of whether the statutory visitation rights of a child's biological grandparent can continue following the termination of parental rights and adoption of the child by nonrelatives. However, in *Mimkon v. Ford,* 66 *N.J.* 426, 332 *A.*2d 199 (1975), this Court considered the application of the Grandparent Visitation Statute in the context of a stepparent adoption. After the child's birth mother died, the child's father remarried and the child was adopted by her stepmother. *Ibid.* The child's maternal grandmother subsequently instituted an action to visit the child over the objections of the natural father and the child's stepmother. *Ibid.* This Court upheld the grandmother's right to visitation, holding that the statutory right to grandparental visitation, in the context of stepparent adoption, was not in conflict with the policies of the Adoption Act. *Id.* at 436, 332 *A.*2d 199. *Mimkon* was decided prior to the 1993 amendments to the Grandparent Visitation Statute and the 1993 amendments to the Adoption Act. Therefore, *Mimkon* does not conclusively resolve this case. However, this Court's observations regarding the policies underlying the Adoption Act in *Mimkon* merit discussion.

In *Mimkon,* we stressed that the Adoption Act was primarily designed to protect children placed for adoption because their parents were "unwilling or unable to care for them." *Mimkon, supra,* 66 *N.J.* at 434, 332 *A.*2d 199. "That is why the judgment of adoption terminates all relationships between the child and his natural parents." *Ibid.* The Court emphasized that different considerations apply in cases involving stepparent, rather than nonrelative adoption. With stepparent adoption, "the policy of insulating the adoptive child from his natural parents is not so clearly compelling as it would be in other situations." *Id.* at 435, 332 *A.*2d 199. Specifically, we observed that "nothing in this opinion is intended to suggest that the grandparent could invoke the visitation statute after the child of the grandparent has in fact

been adjudicated to have 'forsaken his parental obligations and adoption ordered.' In that case the policy of *N.J.S.A.* 9:3–17(c).30, subd. A plainly controls." *Ibid.,* n. 3. That statute provided that to give effect to the public policy of the state regarding the welfare of children requiring placement for adoption it was necessary to "protect the adopting parents ... from later disturbance of their relationships to the child by the natural parents." *Id.* at 432, 332 *A.*2d 199. We reaffirm our observation in *Mimkon* that visitation in the context of nonrelative adoption conflicts with the policies underlying the Adoption Act. The holding of *Mimkon* should not be extended to nonrelative adoption.

Courts in other jurisdictions have addressed the tension between their grandparent visitation and adoption statutes. However, those decisions are guided mainly by the specific statutory provisions, which differ from New Jersey's, and are of limited precedential value. Jurisdictions with adoption and visitation statutes similar to ours have declined to impose grandparental visitation rights in nonrelative adoption settings. *See, e.g., Sowers v. Tsamolias,* 262 *Kan.* 717, 941 *P.*2d 949, 951 (1997) (holding that after adoption, parents of birth parents no longer "grandparents" of the child within the meaning of the visitation statute); *Hicks v. Enlow,* 764 *S.W.*2d 68, 73 (Ky.1989) (interpreting interplay between visitation statute and adoption statute to allow visitation in case of stepparent adoption, but to disallow visitation in the case of nonrelative adoptions); *L.F.M. v. Department of Soc. Serv.,* 67 *Md.App.* 379, 507 *A.*2d 1151, 1159 (1986) (holding that grandparents had no right to visit children over objection of confidential prospective adoptive parents).

III.·

Our finding that the Legislature did not intend the Grandparent Visitation Statute to apply to situations where the child is adopted by nonrelative adoptive parents is further supported by the Legislature's specific rejection of the proposed open adoption provision to the Adoption Act. Open adoption "reflects an agreement be-

tween the adoptive parents and one or more members of the child's biological family permitting visitation after the child has been formally adopted." *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 361, 736 *A.*2d 1246 (1999). That is exactly the arrangement the grandparents are asserting in this case, albeit without the consent of the adoptive parents.

The 1993 amendments to the Adoption Act rejected a proposed open adoption provision which would have provided:

With the consent of the adopting parent the court may provide in the adoption order for visitation or other type of communication with the child after the adoption by any person who had a relationship with or was biologically related to the adopted child. This provision may be modified by the court, subsequent to the adoption on petition of the adoptive parent for good cause shown.

[A. 1418, § 13(d), 205 th Leg., 1 st Sess. (N.J. May 14, 1992) (above language was never enacted).]

The language of that rejected provision contemplated that post-adoption contact could continue between a child and biological family only with the *voluntary consent* of the adopting parent. It was thus never anticipated, even if the concept of open adoption had been enacted, to compel visitation against the wishes of the adoptive parents. In this case, the adoptive parents do not (and have never) consented to such a visitation agreement.

To permit post-adoption visitation in this case represents a direct conflict with the Legislature's rejection of open adoption. New Jersey courts have repeatedly reinforced the principle that open adoption will not be enforced absent express legislative command. *See, e.g., In re Guardianship of K.H.O., supra,* 161 *N.J.* at 361, 736 *A.*2d 1246; *In re Guardianship of D.M.H.,* 161 *N.J.* 365, 386, 736 *A.*2d 1261 (1999); *In re Adoption of a Child by D.M.H., supra,* 135 *N.J.* at 493, 641 *A.*2d 235. This Court has declined to resolve the question of the validity or enforceability of an open adoption noting that the Legislature has deferred its consideration and that "the issue of open adoption represents a significant policy issue which should be addressed in separate legislation." *In re Adoption of a Child by D.M.H., supra,* 135 *N.J.* at 494, 641 *A.*2d 235 (quoting Senate Judiciary Committee, *Statement to Senate No. 685* (1993)).

■ The above cited cases have highlighted the importance of preserving adoptive parents' autonomy in raising their child after the parental rights of biological parents are terminated. This Court has noted that the primary purpose of the termination of rights provision in the adoption statute is to "protect adoptive parents from post-adoption disruptions in their relationship with adoptive children, by natural parents who have surrendered children for adoption or where parental rights been severed." *In re Adoption of a Child by D.M.H., supra,* 135 *N.J.* at 491, 641 *A.*2d 235 (quoting *In re Adoption of Children by F.,* 170 *N.J.Super.* 419, 422–423, 406 *A.*2d 986 (Ch.Div.1979)). This Court acknowledged that the revised adoption statute "maintains the policy that adoption ends the parental role of the biological parents and transfers that role to the adoptive parents." *In re Adoption of a Child by D.M.H., supra,* 135 *N.J.* at 491, 641 *A.*2d 235. Even arrangements. that are entered into with mutual consent permitting continued contact between biological relatives and the adopted child, "cannot be judicially enforced given the potential for disruption of the child's family life under such arrangements and the *fact that under the adoption laws the adoptive parents' rights are paramount." In re Guardianship of K.H.O., supra,* 161 *N.J.* at 362, 736 *A.*2d 1246 (emphasis added).

## IV.

■ An examination of the legislative history demonstrates that the overarching purpose of the Legislature in revising the Adoption Act was to facilitate and encourage adoptions. It is a well-established principle that administrative agencies are entitled to substantial deference in the area of their expertise. *Mayflower Secs. Co. v. Bureau of Secs.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). We agree with the position of the Division of Youth and Family Services ("DYFS"), which intervened as *amicus curiae* in this interlocutory appeal, that the Grandparent Visitation Statute was not intended to be applied in the case of adoption by nonrelatives, and must not be applied because court-enforced visitation by

biological grandparents would discourage—if not prevent—adoption.

We place great reliance on the position of DYFS that to permit application of the Grandparent Visitation Statute to adoption by nonrelatives or where there has been an involuntary termination of parental rights, as in this case, would have a chilling effect on prospective adoptive parents. According to DYFS, as of January 1995 there were 1,049 children who were legally freed for adoption, and awaiting finalization of that status. Only 33 of those children were awaiting a relative adoption. The vast majority of the adoptive homes have no connection to the child's biological family. The effect of the Grandparent Visitation Statute is very important to the children DYFS serves.

■ The ultimate purpose of the Adoption Act is to support the newly-created family and to encourage other families to adopt a child with the knowledge that biological relatives will not interfere with the new family unit. As DYFS stated in its brief:

> It is under this legislative scheme that the State's compelling interest in protecting children in a stable and permanent home is firmly established as paramount. This strong public policy must not be undermined by the forced imposition of biological family visitation after adoption. The Grandparent Visitation Statute must not be interpreted to qualify or condition an adoption. To interpret these two statutes in any other way would lead to an unintended result and effectively undermine the intended purpose of the Adoption Act, in derogation of the rules governing statutory construction.

*See Adams v. Cooper Hosp.*, 295 *N.J.Super.* 5, 12–13, 684 *A.*2d 506, *certif. denied*, 148 *N.J.* 463, 690 *A.*2d 610 (1997).

■ Some of the reasons adoptive parents fear grandparent visitations are evident in this case. The adoptive parents do not want any further connection with TS, whose rights were terminated because he presented a continuing threat to V's safety and well-being. *In re Adoption of Child by W.P. and M.P., supra*, 308 *N.J.Super.* at 386, 706 *A.*2d 198. They fear that on his release from prison, TS will pursue them and their daughter, either on his own or through his parents. As the trial court observed, although TS's parents have obtained a Final Restraining Order against him

under the Domestic Violence Act, such an order can be vacated at any time. It is very difficult for parents to turn aside their own child. In the past, when TS was released from prison he always returned to his parents' home. Certainly, it is possible that the grandparents' visitation may provide unsupervised opportunity for TS to have association with V, even though his parental rights have been severed based on parental unfitness.

Moreover, the nonrelative adoptive parents have faced protracted and expensive litigation over visitation rights. To subject the adoptive parents now to a best interests hearing, as proposed by the dissent, would further prolong the already lengthy and cumbersome court proceedings. (*Post* at 200, 748 *A*.2d at 539). As noted previously, the intent of the adoption statute is to encourage and facilitate adoptions, not to hinder them.

## V.

We understand that grandparents wish to maintain close contact with their grandchildren. Nonetheless, the situation changes when a child is adopted by nonrelatives. V's adoptive parents also have an adopted son, slightly older than V. If the grandparents of his biological parents sought the same visitation rights as the respondents do in this case, one can imagine the confusion that would be created. The stability of the new family unit would be seriously jeopardized. The adoptive parents would have to comply with two visitation schedules with two different families. Under such circumstances, it would be very difficult for the adoptive family to create and maintain a new stable and intact family unit.

An adoptive family must be given the right to grow and develop as an autonomous family, and must not be tied to the very relationship that put the child in the position of being adopted. Any other ruling would relegate the adoptive parents to " 'second-class' status.' " *Mimkon, supra,* 66 *N.J.* at 441, 332 *A*.2d 199 (Clifford, J., dissenting). As Justice Clifford correctly observed, an adoptive parent (a mother in that case), is "for every purpose and from every perspective and in any terms save blood as much

the maternal parent to the child as is any other mother to her daughter." *Ibid.* The true grandparents of V (who would have visitation rights under the Grandparent Visitation Statute) are now the parents of her adoptive parents. They are now V's family.

We vacate the judgment of the Appellate Division and reverse the order of the trial court filed October 29, 1998.

PORITZ, C.J., dissenting.

This case raises the issue whether grandparents who have had a relationship with their granddaughter since she was born can seek visitation rights under *N.J.S.A.* 9:2–7.1 (the "Grandparent Visitation Statute")[1], after the child at age four is adopted by nonrelatives. The child's adoptive parents claim, and a majority of the Court agrees, that the Grandparent Visitation Statute conflicts with policies enunciated in the Adoption Act, *N.J.S.A.* 9:3–37 to – 56, and should not be given full force and effect. *Ante* at 163–64, 748 *A.*2d at 517–18. The adoptive parents also claim that application of the visitation statute to them would violate their right of privacy, and more specifically, their right of parental autonomy. I believe that the Adoption Act and the Grandparent Visitation Statute are consonant with one another, each designed to provide for the best interests of the children who come under the Acts' provisions. I further believe that the visitation statute, as applied in this case, does not impinge impermissibly on parental rights because of the showings that must be made by the grandparents before visitation may be allowed, and because of the restrictions that may be placed on visitation to protect the parents' interests. I would therefore uphold the Grandparent Visitation Statute. Because every case is highly dependent on the facts adduced under the statutory standards, I would remand the matter to the

---

[1] As does the majority, I will refer to the statute as the "Grandparent Visitation Statute," although I note that under its terms both grandparents and siblings are allowed to petition for visitation rights.

trial court to determine, after a hearing, whether visitation would be in the child's best interests.

## I

JH gave birth to a girl, V, on August 11, 1994. On February 21, 1995, when V was six months old, JH voluntarily placed V with WP and MP through a private adoption arrangement. On the filing of a complaint for adoption by WP and MP, a preliminary adoption hearing was held and, in April 1995, JH's parental rights were terminated.

WP and MP are not related to V or her biological family. At the time of the child's placement, her father, TS, was incarcerated and unaware of the adoption proceedings. He subsequently learned about the proposed adoption and filed an objection with the court in the spring of 1995. On July 21, 1995, TS was released from prison, after which he resided with his parents and worked for his father. He petitioned for visitation with his daughter and obtained an order in September permitting him to visit V at least once a week. Shortly thereafter, the order was modified twice, first to allow TS's parents, KS and MS (the "grandparents"), to be present during his visits, and then to establish visitation at three hours per week and to require the presence of the grandparents at all times during the visits between TS and V.

TS was incarcerated again in January 1996 for stealing guns from his parents' house. As a result of this incident, the grandparents obtained a restraining order against their son under the Domestic Violence Law, *N.J.S.A.* 2C:25–28. The restraining order is still in effect. One month later, in February 1996, the grandparents petitioned the trial court to adopt V themselves and to obtain custody or extended visitation during the adoption proceedings.

The grandparents claim that they established a relationship with V from the day she was born, a claim that is contested by WP and MP. The record indicates, however, that there has been at least some ongoing contact between V and her paternal grandpar-

ents from her infancy until the present. The trial court allowed the grandparents to intervene in WP's and MP's adoption proceedings on the visitation issue and provided that, if adoption was not granted to WP and MP, the grandparents would have the right to be heard on the issue of custody. The court ordered visitation between V and her grandparents every third Sunday of the month from 9:00 a.m. to 5:00 p.m., but denied the grandparents' application to proceed with adoption.

TS was released from prison on bail in May 1996, and WP and MP sought to vacate visitation by the grandparents out of fear that V's father would gain access to her through her grandparents. On October 30, 1996, the trial court denied the grandparents' request to intervene at the preliminary adoption hearing, as well as their request for custody, permission to proceed with adoption, and increased visitation. The court's order provided, however, that if adoption was granted to WP and MP, a hearing would be promptly scheduled to determine visitation. The order also stated that if adoption was not granted to WP and MP, the grandparents would have the right to participate in a custody trial.

Adoption hearings were held in November 1996, and on December 24, 1996, the trial court issued a written opinion terminating the parental rights of TS followed by a formal order of termination on January 24, 1997. The termination was based in part on TS's history of drug addiction and criminal convictions. TS appealed the ruling unsuccessfully. At the same time, the grandparents continued to seek increased visitation and permission to proceed with adoption, which the trial court continued to deny. The trial court did allow the grandparents to intervene at future-scheduled hearings on the sole issue of visitation, and continued their same visitation schedule.

The adoption of V by WP and MP was finalized on April 1, 1998. The order provided that the Judgment of Adoption:

> shall terminate all relationships between the child and the birth mother, [JH], and putative father, [TS], as well as all rights, duties, and obligations of any person founded on those relationships ... except for any rights which may have vested prior to the entry of this judgment.

The trial court also ordered further briefing on the issue of grandparent visitation, and stayed the final hearing of adoption pending the submission of an updated adoption home study. On September 28, 1998, the trial court issued a written opinion rejecting WP's and MP's claims that the Grandparent Visitation Statute, *N.J.S.A.* 9:2–7.1, is unconstitutional as applied to this case, and that the statute conflicts with the Adoption Act, *N.J.S.A.* 9:3–37 *et seq.* The court awarded the grandparents continued visitation and scheduled another hearing to determine how visitation should proceed. WP and MP appealed. Although initially they agreed to visitation, they later sought and obtained a stay from the Appellate Division. The Appellate Division, however, subsequently dismissed the appeal as improvidently granted in an opinion dated May 14, 1999.

We granted WP's and MP's motion for leave to appeal on July 16, 1999. V is now five years old.

## II

### A. *The Grandparent Visitation Statute*

The Legislature first codified a grandparent's right to petition for visitation in *L.* 1971, *c.* 363, § 1. That statute focused on the status of the parents, specifically, whether one parent was deceased, as a prerequisite to a court's consideration of grandparent visitation. Under the statute, courts were required to apply a best interests of the child test, much like the "consideration of the child's welfare" standard in earlier cases decided on common law principles. *Mimkon v. Ford,* 66 *N.J.* 426, 430, 332 *A.2d* 199 (1975). Specific direction in respect of the contours of the test was not provided. In 1973, the Legislature extended the circumstances under which a grandparent could petition for visitation to situations in which a parent was "divorced or living separate and apart in different habitats, regardless of the existence of a court order or agreement." *L.* 1973, *c.* 100, § 1. Later, in 1987, the Legislature also permitted siblings to petition for visitation. *L.* 1987, *c.* 363 § 2.

The current version of the statute was passed in 1993, when the Legislature decided to eliminate parental status as a prerequisite to the filing of a petition for visitation. *N.J.S.A.* 9:2–7.1 (effective June 29, 1993). The amended statute gives trial courts detailed guidance for determining when visitation may be in a child's best interests. The statute now states:

a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order of visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.

b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:

(1) The relationship between the child and the applicant;

(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;

(3) The time which has elapsed since the child last had contact with the applicant;

(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;

(6) The good faith of the applicant in filing the application;

(7) Any history or physical, emotional or sexual abuse or neglect by the applicant; and

(8) Any other factor relevant to the best interests of the child.

c. With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[*N.J.S.A.* 9:2–7.1.]

Generally, the court is required to consider the relationships between the various family members and the child, always with a view toward the impact of those relationships on "the best interests of the child." *N.J.S.A.* 9:2–7.1(a).

## B. *The Adoption Act*

From its inception, the purpose of New Jersey's Adoption Act has also been to protect children, as well as their natural parents and their adopting parents. *L.* 1953, *c.* 264, § 1 (repealed 1977 and recodified as amended at *L.* 1999, *c.* 53, § 1 (effective Mar. 31,

1999)).  In furtherance of that purpose, the Act has undergone major revisions over the past twenty-three years, in 1977, in 1993, and most recently, in 1999.  Each time the Legislature sought to facilitate adoption in response to perceived impediments, "to simplify and clarify the provisions governing adoption proceedings," to ease private adoption, and to promote early adoption when possible.  Senate Judiciary Committee, Statement accompanying S. 1631, 197th Leg., 1st Sess. (N.J. Aug. 12, 1976).  Most relevant to this case, before the 1977 revisions, a stated public policy of the Act was to "protect the adopting parents from ... later disturbance of their relationships to the child by the natural parents." *L.* 1953, *c.* 264, § 1 (repealed 1977).  In 1977, the Legislature shifted focus from the parents to the child by replacing this provision with a broad statement that the Act should be liberally construed to promote the best interests of children, and that "[d]ue regard shall be given to the rights of all persons affected by an adoption." *L.* 1977, *c.* 367, § 1 (repealed 1993 and recodified as amended at *L.* 1999, *c.* 53, § 1).  The current version of the Act retains that language and adds, as a goal, "that the safety of children be of paramount concern." *L.* 1999, *c.* 53, § 1 (effective Mar. 31, 1999).

The 1977 Act also set forth the legal consequences of adoption. At that time, the Act provided that the entry of a judgment of adoption shall "terminate all relationships between the adopted child and his parents and all rights, duties, and obligations of any person that are founded on such relationships." *L.* 1977, *c.* 367, § 14 (repealed 1993 and recodified as amended at *N.J.S.A.* 9:3–50).  In 1993 the Legislature revised this section to read, in pertinent part:

> The entry of judgment of adoption shall ... terminate all parental rights and responsibilities of the parent towards the adoptive child except for a parent who is the spouse of the petitioner and except those rights that have vested prior to entry of the judgment of adoption.
>
> [*N.J.S.A.* 9:3–50(c).]

That provision remains in the Adoption Act today.

The Act passed in both houses and was signed into law by Governor Florio on December 28, 1993.

## III

The role of this Court in any statutory analysis is to determine the intent of the Legislature and give effect to its enactments if reasonably possible. *G.S. v. Department of Human Servs., Div. Of Youth & Family Servs.*, 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999); *Brooks v. Odom*, 150 *N.J.* 395, 401, 696 *A.*2d 619 (1997); *Green v. Auerbach Chevrolet Corp.*, 127 *N.J.* 591, 598, 606 *A.*2d 1093 (1992). When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will. *State v. Federanko*, 26 *N.J.* 119, 130, 139 *A.*2d 30 (1958); *Builders League, Inc. v. Borough of Pine Hill*, 286 *N.J.Super.* 348, 352, 669 *A.*2d 279 (App.Div.1996). In other words, it is our obligation to make every effort to harmonize separate statutes, even if they are in apparent conflict, insofar as we are able to do so.

The presumption of validity is especially strong here in light of the similar subject matter and common purpose of both statutes— protecting the best interests of children. *Cf. In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 115, 693 *A.*2d 92 (1997) (reading two provisions of Domestic Violence Act together to determine Legislature's intent); *F & W Assocs. v. County of Somerset*, 276 *N.J.Super.* 519, 525–26, 648 *A.*2d 482 (App.Div.1994) (harmonizing New Jersey Development District Act and Municipal Land Use Law to share "common purpose" of control of traffic); *Division of Youth & Family Servs. v. P.M.*, 301 *N.J.Super.* 80, 90, 693 *A.*2d 941 (Ch.Div.1997) (holding that courts must "construe together all existing statutes on the same subject matter," particularly when statutes address similar problems). Statutes that deal with the same matter or subject should be read *in pari materia* [2] and construed together as a "unitary and harmonious whole." *Board of Educ. v. Neptune Township Educ. Ass'n*, 144 *N.J.* 16, 23, 675 *A.*2d 611 (1996). This maxim of statutory construction is especial-

---

[2] Literally, as an adjective, "upon the same matter or subject," or loosely, as an adverb, "in conjunction with." *Black's Law Dictionary* 794 (7th ed.1999).

ly pertinent when, as in this case, the statutes in question were passed in the same session. *Mimkon, supra,* 66 *N.J.* at 433–34, 332 *A.*2d 199; *Sellitto v. Borough of Spring Lake Heights,* 284 *N.J.Super.* 277, 288, 664 *A.*2d 1284 (App.Div.1995), *cert. denied,* 143 *N.J.* 324, 670 *A.*2d 1065 (1996).

The Adoption Act and the Grandparent Visitation Statute were considered by the Legislature at approximately the same time by the Senate Judiciary Committee, and passed in both houses of the Legislature only six months apart. The first, the Grandparent Visitation Statute, was introduced in the Senate on January 14, 1992, to be followed three months later, on April 6, 1992, by the Adoption Act. One week after the Grandparent Visitation Statute was referred to the Senate Judiciary Committee (June 18, 1992), that same Committee took the Adoption Act under consideration (June 25, 1992). In the Assembly, also, three months passed between the introduction of the Grandparent Visitation Statute (February 24, 1992) and the Adoption Act (May 14, 1992). More to the point, both houses were moving the two statutes through during the same time period. Ultimately, the two laws were approved by the Legislature in 1993, and were signed by Governor Florio six months apart, one on June 29, 1993, and the other on December 28, 1993.

The legislative history of these two statutes suggests to me that the Legislature was fully aware of the possible interactions between them, and of the parallel policies that motivated their enactment. I cannot accept the majority's assumption that the members of the Legislature did not know or understand what they were doing; nor can I accept the majority's conclusion that the Legislature did not intend both statutes to be fully effective. *Ante* at 168, 748 *A.*2d at 521. Moreover, the majority holds that the Grandparent Visitation Statute as applied to adoptive families would thwart the purpose of the Adoption Act—to encourage adoption. *Ante* at 175, 748 *A.*2d at 525. A close examination of both statutes and their legislative histories refutes this holding.

## IV

### A. *Legislative Intent: Application of the Grandparent Visitation Statute to Non-relative Adoptive Families*

The majority believes that the Legislature could never have intended the visitation statute to apply to children adopted by non-relatives. *Ante* at 166–67, 748 *A.*2d at 520. Under this reading of the Adoption Act, only contact between an adopted child and her biological family that is invited by the non-relative adoptive parent or parents is permitted. I cannot find in the Adoption Act an intent to prohibit enforcement of the Grandparent Visitation Statute in such cases.

First, I observe that the Grandparent Visitation Statute has never contained language limiting visitation to biological and relative-adoptive families. The provision allowing "[a] grandparent or any sibling of a child" to apply for visitation on its face applies to all grandparents and siblings. *N.J.S.A.* 9:2–7.1(a). Although the Legislature could have passed a statute that granted visitation only in non-adoption or relative adoption cases, as many other states have,[3] it chose not to do so. Alternatively, the Legislature could have added a provision in the Adoption Act specifically terminating all post-adoption contact between an adopted child and her biological grandparents. Exactly the opposite is true.

---

[3] *Ala.Code* § 26–10A–30 (1990); *Ariz.Rev.Stat.* § 25–409(F) (Supp.1999); *Cal. Fam.Code* § 3102(c) (West 1994); *Colo.Rev.Stat.* § 19–1–117(1)(b) (Supp.1996); *Fla. Stat.* ch. 752.01(3) (1997); *Ga.Code Ann.* § 19–7–3(b) (1999); 750 *Ill. Comp. Stat.* ⅚₀₇(b)(2)(B) (West 1999); *Ind.Code* § 31–17–5–9 (1997); *Me.Rev.Stat. Ann.* tit. 19–A, § 1802 (West 1998); *Mass. Gen. Laws* ch. 119, § 39D (Supp.1999); *Minn.Stat.* § 257.022, subd. 3 (1998); *Miss.Code Ann.* § 93–16–7 (1999); *Mo. Rev.Stat.* § 452.402(6) (Supp.2000); *Mont.Code Ann.* § 40–9–102(5) (1999); *N.C. Gen.Stat.* § 50–13.2(b)(1) (1999); *N.M. Stat. Ann.* § 40–9–2(F) (Michie 1994); *N.D. Cent.Code* § 14–09–05.1 (1997); *S.D. Codified Laws* § 25–4–54 (Michie 1999); *Tenn.Code Ann.* § 36–6–302(d) (Supp.1999); *Utah Code Ann.* § 30–5–2(3) (1998); *Vt. Stat. Ann.* tit. 15, § 1016 (1989); *Va.Code Ann.* § 63.1–233 (Michie Supp.1999); *W. Va.Code* § 48–2B–9(b) (1999); *Wis. Stat.* § 767.245(3)(c) (1991); *Wyo. Stat. Ann.* § 20–7–101(c) (Lexis 1999).

As noted earlier, the Adoption Act unequivocally severs the relationship between the biological parent and the child, but the Act stops there. *See N.J.S.A.* 9:3–50(c) ("The entry of a judgment of adoption shall . . . terminate all parental rights and responsibilities of the parent towards the adopted child. . . ."); *N.J.S.A.* 9:3–41(a) (stating that instrument of surrender "means the permanent end of the relationship and all contact between the parent and child"). These provisions cover the relationship between parent and child only, and not any other biological relationship. Although the 1977 Act had terminated "all rights, duties and obligations of *any* person that are founded [on the relationship between the parent and child]," which would include grandparents and other relatives, *L.* 1977, *c.* 367, § 14, (repealed 1993) (emphasis added), this provision was deleted in 1993. It defies common sense to claim that this language was not deliberately dropped, especially since it would have conflicted with the Grandparent Visitation Statute, which was under consideration by the Legislature at the same time.

The majority also points to a proposed version of the Grandparent Visitation Statute in the Assembly containing a provision that would allow trial courts to consider the objections of a parent to an application for visitation by the "parent's own blood relatives." *Ante* at 166, 748 *A.*2d at 520. The Court attributes to this proposal a significance it simply does not have. If the Legislature intended to give parents veto power over visitation by blood relatives, it would have included this provision in the final version of the bill. It did not. I understand the Legislature's intent to be expressed more clearly in the enacted statute rather than the unenacted provision. *Petrangeli v. Barrett,* 33 *N.J.Super.* 378, 386, 110 *A.*2d 313 (App.Div.1954). In any case, parental consent is not irrelevant to the visitation decision under the standards set forth in the current statute. In a visitation dispute, the trial court is required to consider the relationship between the child's parents and the applicants, *N.J.S.A.* 9:2–7.1(b)(2), and "any other factor relevant to the best interests of the child," *N.J.S.A.* 9:2–7.1(b)(8),

which necessarily includes the parents' determination as to whether visitation is appropriate.

The majority also finds that the confidentiality provisions of the Adoption Act, *N.J.S.A.* 9:3–51 and 9:3–52 (requiring all records to be sealed and accessible only by order of the court), are incompatible with the concept of permitting visitation by the biological grandparents. *Ante* at 170, 748 *A.*2d at 522). When read together, however, the visitation statute and the confidentiality provisions of the Adoption Act complement one another. This is so because the standards applicable in a visitation proceeding are, as I noted earlier, focused on the "relationships" between the various family members affected by a petition for visitation. Only in those cases where the grandparents have had a relationship with the child, can they even make a threshold showing that they come under the visitation statute. Although the confidentiality provisions of the Adoption Act may operate to prevent such relationships from developing, in those cases where they do exist, the visitation statute is applicable by its very terms. Here, the biological grandparents have been visiting with V throughout the last five years and have actively sought a continuing relationship with her since her birth.

Much has been said about the applicability of *Mimkon* to this case. In *Mimkon,* a divorced mother and her child had resided with the maternal grandmother for over two years when the mother died. *Supra,* 66 *N.J.* at 429, 332 *A.*2d 199. The father took care of his child after her mother's death and, when he remarried, his wife adopted his child. *Ibid.* Because the grandmother was subsequently denied visitation, she sought relief from the courts under the 1973 Grandparent Visitation Statute. *Ibid.* Justice Pashman, writing for the Court, described both the unique bond between children and their grandparents, and the difference between allowing a relationship with natural parents after adoption and allowing a relationship with grandparents:

> Interference by a natural parent with the relationship between the child and the adopting parents introduces alternative and conflicting authority figures in the child's life, creating tremendous emotional tension in the child and ultimately

threatening to undermine the authority of the adoptive parents and their ability to make parental decisions. Grandparents ordinarily play a very different role in the child's life; they are not authority figures and do not possessively assert exclusive rights to make parental decisions. At best, they are generous sources of unconditional love and acceptance, which complements rather than conflicts with the roles of the parent.

[G]randparent visitation involves a much lesser risk of threat to the physical or psychological well-being of the child or to the development of a healthy and natural relationship between the child and the adopting parents than might continued contact by the natural parent.

\* \* \* \*

It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known.

[*Id.* at 435–37, 332 *A*.2d 199.]

The Court ordered a hearing for a determination "as to whether or not, at the present time and as circumstances now exist, it would be in the child's best interests to enter an order for continued visitation." *Id.* at 438, 332 *A*.2d 199.

A footnote in *Mimkon* contained dicta distinguishing cases in which a parent had been adjudicated unfit and a grandparent sought visitation after an adoption had been ordered. *Id.* at 435 n. 3, 332 *A*.2d 199. At that time, the visitation statute only applied when "either or both of the parents of a minor child ... are deceased, or divorced or living separate and apart in different habitats." *L.* 1973, *c.* 100, § 1. It is therefore not surprising that the Court, speculating about cases involving unfit parents, turned to the now-repealed public policy of the 1953 Adoption Act, which then provided: "[i]t is necessary and desirable ... to protect the adopting parents ... from later disturbance of their relationships

to the child by the natural parents." *L.* 1953, *c.* 264, § 1 (repealed 1977). That provision has since been replaced with language requiring that "due regard" be given to the rights of "all persons affected by an adoption." *L.* 1999, *c.* 53, § 1 (effective Mar. 31, 1999).

It is now the Court's obligation, twenty-five years after *Mimkon*, to consider grandparent visitation in the context of a non-relative adoption and under substantially modified statutory schemes.

### B. *Legislative Intent: Open Adoption*

The majority characterizes the application of the Grandparent Visitation Statute to non-relative adoptive families as an open adoption arrangement,[4] and notes that the Legislature has expressly disapproved of such arrangements. *Ante* at 171–72, 748 A.2d at 522–23. The majority concludes that the Legislature's reluctance to pass a broad open adoption provision, indicates disapproval of grandparent visitation after non-relative adoptions. *Ante* at 173, 748 A.2d at 523.

The original version of the 1993 Adoption Act had contained an open adoption provision that read:

> With the consent of the adopting parent the court may provide in the adoption order for visitation or other type of communication with the child after the adoption by any person who had a relationship with or was biologically related to the adopted child. This provision may be modified by the court subsequent to the adoption on petition of the adoptive parent for good cause shown.
>
> [A. 1418, § 13(d), 205th Leg., 1st Sess. (N.J. May 14, 1992) (above language was never enacted).]

---

4 "Open adoption" refers to any ongoing contact between a child adopted by non-relatives and his or her biological relatives. Generally, a written agreement provides for open adoption, but in many states, including New Jersey, open adoption can be an informal arrangement. *See* Carol Amadio and Stuart L. Deutsch, *Open Adoption: Allowing Adopted Children to "Stay in Touch" With Blood Relatives*, 22 J. Fam. L. 59, 60 (1983) (analyzing court-approved written contracts for open adoption); *see also In re Guardianship of K.H.O.*, 161 *N.J.* 337, 361, 736 A.2d 1246 (1999) (discussing informal open adoption agreement).

This provision was deleted before final passage of the bill in the Senate. In the Statement to the bill, the Judiciary Committee explained: "While it is not the intent of the committee in deleting this language to discourage open adoptions, it was felt that the issue of open adoption represents a significant policy issue which should be addressed in separate legislation." Statement accompanying A. 1418, 205th Leg., 2d Sess. (N.J. Mar. 18, 1993).

The Court apparently believes that the decision not to pass a broad open adoption provision is an expression of legislative intent to prevent *any* post-adoption visitation by biological relatives—an expression strong enough to overcome the actual language of the Grandparent Visitation Statute. It is, in my view, more plausible that grandparent and sibling visitation was as far as the Legislature wished to go in providing for possible contact with members of a child's biological family after a non-relative adoption. Most telling, two months after deleting the open adoption provision, the Senate passed the Grandparent Visitation Statute. When the Senate passed the final version of the visitation statute, I must presume that it was fully aware of its position on open adoption and its actions with respect to the Adoption Act. *See Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.2d* 388 (1969). The plain language of the Grandparent Visitation Statute allows *any* grandparent to apply for visitation rights, regardless of the status of the child's parents, and regardless of whether the child lives with her natural or adoptive parents.[5]

### C. *Legislative Intent: To Facilitate Adoptions*

The Division of Youth and Family Services (DYFS), Department of Human Services, has objected to the application of the

---

[5] This Court has recently indicated that agreements permitting post-adoption contact between biological parents and adoptive parents may be recognized if they are entered into with counseling and advice, are voluntary and mutual, and are in the best interests of the child. *K.H.O., supra,* 161 *N.J.* at 362, 736 *A.2d* 1246; *In re Guardianship of DMH,* 161 *N.J.* 365, 386, 736 *A.2d* 1261 (1999). However, such arrangements are not judicially enforceable. *K.H.O., supra,* 161 *N.J.* at 362, 736 *A.2d* 1246.

Grandparent Visitation Statute when there has been an involuntary termination of parental rights, or when a non-relative adoption has been finalized. DYFS believes enforcement of the Grandparent Visitation Statute in those cases would create a chilling effect on future adoptions because of the risk of litigation by the child's biological relatives. DYFS is also concerned that grandparent visitation could facilitate access between a parent whose rights have been involuntarily terminated and his or her child, thereby endangering the child. In the view of DYFS, litigation about visitation could jeopardize the confidentiality mandated by the Adoption Act, or lead to DYFS being named as the defendant in such cases.[6]

An administrative agency is generally afforded substantial deference in its area of expertise. *Mayflower Secs. Co. v. Bureau of Secs.*, 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). However, appellate courts are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *Id.* at 93, 312 *A.*2d 497; *see also DiBlasi v. Board of Trustees, Pub. Employees' Retirement Sys.*, 315 *N.J.Super.* 298, 302, 718 *A.*2d 241 (App.Div.1998). If the agency's statutory interpretation contradicts the plain language or undermines the Legislature's intent, this Court has not hesitated to reject the agency's view. *GE Solid State, Inc. v. Director, Div. of Taxation*, 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993).

This is particularly the case where, as here, the agency has advanced only general concerns and anecdotal evidence in an attempt to demonstrate that enforcement of the Grandparent Visitation Statute will have a harmful effect on adoptions. In fact, there is evidence demonstrating that grandparent visitation can coexist in adoption cases. *See* Carol Amadio and Stuart L. Deutsch, *Open Adoption: Allowing Adopted Children to "Stay in*

---

[6] The agency contends further that its ability to place children out-of-state as mandated under the Adoption and Safe Families Act, 42 *U.S.C.A.* § 671 (1999), will be hindered, but this claim is really subsumed under the agency's other claims.

*Touch" with Blood Relatives,* 22 *J. Fam. L.* 59, 78 (1983–84) (describing Illinois Department of Children and Family Services' success in recruiting adoptive parents willing to permit grandparents continued contact with children). I am unwilling to limit the applicability of the Grandparent Visitation Statute because DYFS has presented two examples of prospective adoptive parents' objections.

Most important, contrary to the fears expressed by DYFS, the statutory standards in the Grandparents Visitation Statute and the power of the courts to fashion equitable remedies would prevent the "parade of horribles" offered up by the agency. Under the visitation statute, the best interests of the child are paramount in the consideration of a visitation application. Thus, the court could order supervised visitation to prevent contact with an unfit biological parent and, when there is a danger of access despite supervision, I anticipate that visitation would be denied.

DYFS refers to a case currently pending in Camden County Family Court, in which a maternal grandmother has brought a visitation action naming DYFS as a defendant because the identity of the adoptive parents is unknown, to support its concern that the confidentiality provisions of the Adoption Act are compromised by the visitation statute. These concerns can be readily resolved. I interpret the standards set out in the visitation statute to limit the right of grandparents to petition for visitation to those cases where there has been a relationship with the child prior to formal adoption. Such a ruling should both ameliorate the Agency's concerns and prevent unnecessary interference in the adopted child's family life.

## V

Having determined that application of the Grandparent Visitation Statute does not conflict with the language or intent of the Adoption Act, I turn to the petitioners' claim that the Grandparent Visitation Statute violates the Due Process Clause of the United

States Constitution, *U.S. Const.* amend. XIV, § 1, as applied in this case.[7] In my opinion, it does not.

I begin with the presumption that the Grandparents Visitation Statute is constitutional—a presumption that may be rebutted only on a showing that a provision of the Constitution is clearly violated by the statute. *See Board of Educ. v. Caffiero,* 86 *N.J.* 308, 318, 431 *A.*2d 799, *appeal dismissed,* 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981). Petitioners argue that the Grandparents Visitation Statute, as applied to them, impermissibly intrudes upon their due process right of parental autonomy. In support of their argument, they rely on United States Supreme Court cases such as *Santosky v. Kramer,* 455 *U.S.* 745, 747–48, 102 *S.Ct.* 1388, 1391–92, 71 *L.Ed.*2d 599, 603 (1982) (state cannot terminate parental rights except to protect child who has been "permanently neglected"); *Wisconsin v. Yoder,* 406 *U.S.* 205, 233–34, 92 *S.Ct.* 1526, 1542, 32 *L.Ed.*2d 15, 35–36 (1972) (state cannot compel Amish children over sixteen to attend public school); *Stanley v. Illinois,* 405 *U.S.* 645, 657–58, 92 *S.Ct.* 1208, 1216, 31 *L.Ed.*2d 551, 562 (1972) (state cannot take away custody of children without hearing establishing that parent is unfit); *Pierce v. Society of Sisters,* 268 *U.S.* 510, 534–35, 45 *S.Ct.* 571, 573, 69 *L.Ed.* 1070, 1078 (1925) (compulsory public school attendance law invalid due to parent's liberty interest in child's education and religious upbringing); and *Meyer v. Nebraska,* 262 *U.S.* 390, 399, 43 *S.Ct.* 625, 626, 67 *L.Ed.* 1042, 1045 (1923) (parent's right to "establish a home and bring up children" includes right to engage German teacher). These cases recognize within the family a zone of protection from state interference in the "custody, care and nurture of [a] child," *Prince v. Massachusetts,* 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.* 645, 652 (1944).

Parental rights, however, are not absolute. These cases also acknowledge the states' strong *parens patriae* interest in the

---

[7] As WP and MP do not raise a state constitutional claim, I do not address the validity of the statute under the New Jersey Constitution.

welfare of children, and in the structure and stability of the family. *See, e.g., Santosky, supra,* 455 *U.S.* at 766, 102 *S.Ct.* at 1401–02, 71 *L.Ed.*2d at 615; *Prince, supra,* 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652–53. Thus, the states still retain "a wide range of power for limiting parental freedom and authority in things affecting [a] child's welfare" and, also, in regard to "regulation in the public interest." *Prince, supra,* 321 *U.S.* at 166, 167, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652; *see also Yoder, supra,* 406 *U.S.* at 233–34, 92 *S.Ct.* at 1542, 32 *L.Ed.*2d at 35–36 (recognizing that parent's power may be subject to limitation if court determines that parental decision has potential for significant social burden). By way of example, compulsory schooling for children under sixteen, child labor laws, and mental health commitment procedures for minors have been upheld as permissible state regulations even when they conflict with parental decisionmaking. *See Yoder, supra,* 406 *U.S.* at 228, 92 *S.Ct.* at 1539, 32 *L.Ed.*2d at 32 (state's power to compel school attendance up to certain age, make reasonable regulations for all schools, and prescribe curriculum for public schools is undiminished by parents' conflicting preferences regarding child's education); *Prince, supra,* 321 *U.S.* at 168–69, 64 *S.Ct.* at 443, 88 *L.Ed.* at 653–54 (requiring all persons, including guardians, to comply with child labor laws); *Parham v. J.R.,* 442 *U.S.* 584, 604, 99 *S.Ct.* 2493, 2505, 61 *L.Ed.*2d 101, 120 (1979) (child entitled to hearing before parents can place child in an institution for mental health care).

Because we recognize a protected zone of parental autonomy, when the state intrudes on parents' decisions concerning their children, the federal Constitution requires that this Court examine the degree of intrusion, the importance of the governmental interest asserted, and the extent to which that interest is served by the challenged regulation. *See Moore v. City of E. Cleveland,* 431 *U.S.* 494, 499, 97 *S.Ct.* 1932, 1936, 52 *L.Ed.*2d 531, 537 (1977) (plurality opinion). Application of the legal framework within which these difficult issues are determined involves a careful consideration of competing interests and a tough call on the ultimate question. Decisions affecting the family are often contro-

versial, sometimes highly charged. The question before us in this case is no different. Most of us have strongly held views about family autonomy and about permissible state involvement in family matters. The Court's obligation is to examine precedent, consider the values expressed in the statute, and weigh the constitutional right invoked by the respondents. Here, the Court must determine whether a state statute violates the federal Constitution by permitting visitation, in certain circumstances, between biological grandparents and a grandchild who has been adopted by non-relatives.

First, I note that other state courts have split on whether grandparent visitation statutes are constitutional. Some have invalidated their states' statutes as impermissible intrusions on parental autonomy. *See, e.g., Brooks v. Parkerson,* 265 *Ga.* 189, 454 *S.E.*2d 769, 773–74 (Ga.), *cert. denied,* 516 *U.S.* 942, 116 *S.Ct.* 377, 133 *L. Ed.*2d 301 (1995) (finding statute unconstitutional "under both the state and federal constitutions because it does not clearly promote the health or welfare of the child and does not require a showing of harm before state interference is authorized"); *Williams v. Williams,* 24 *Va.App.* 778, 485 *S.E.*2d 651, 654 (1997), *aff'd as modified,* 256 *Va.* 19, 501 *S.E.*2d 417 (1998) (Virginia statute's best interests test insufficient to protect parental right to autonomy in child rearing under the Fourteenth Amendment). Yet, other state courts have found that grandparent visitation is not a significant encroachment on parents constitutional rights. These courts have recognized that parents' rights are not absolute and have upheld visitation statutes based on a best interests test. *See, e.g., King v. King,* 828 *S.W.*2d 630, 632 (Ky.), *cert. denied,* 506 *U.S.* 941, 113 *S.Ct.* 378, 121 *L.Ed.*2d 289 (1992) (under rational basis test, statute does not impermissibly infringe on parents' fundamental rights because visitation not automatic and statute provides adequate safeguards); *Herndon v. Tuhey,* 857 *S.W.*2d 203, 209–10 (Mo.1993) (statute constitutional under rational basis test in light of minimal intrusion on parent-child relationship and narrow tailoring of statute); *Michael v. Hertzler,* 900 *P.*2d 1144, 1149 (Wyo.1995) (statute did not violate

father's due process rights because statute has best interests test that represents compelling state interest, contains adequate safeguards to protect parents, and is narrowly tailored).[8]

In New Jersey, pursuant to their equity and *parens patriae* jurisdiction, family courts routinely decide issues of custody, visitation, child support, and myriad other aspects of domestic relations that affect parents' authority to raise their children without interference from the state. *See, e.g., Beck v. Beck,* 86 *N.J.* 480, 485, 497, 432 *A.2d* 63 (1981) (courts have "authority to decree joint custody of children" and *sua sponte* custody determination is within trial court's discretion); *Fantony v. Fantony,* 21 *N.J.* 525, 535, 122 *A.2d* 593 (1956) (court's ability to regulate child custody is independent of parents' domicile and "has its origin in the protection that is due to the incompetent or helpless"). *Cf. Muhlenberg Hosp. v. Patterson,* 128 *N.J.Super.* 498, 503, 320 *A.2d* 518 (Law Div.1974) (ordering blood transfusion for infant at risk of irreparable brain damage although parents objected to transfusion). Normally, those decisions are not perceived to threaten family autonomy because they respond to problems created by broken relationships at a time when intervention is universally perceived as necessary, and because the dispute often involves parents with equal interests. Even so, the appropriate response to issues raised by broken relationships is not always clear, especially when the parties are not the biological parents. *See, e.g., Watkins v. Nelson,* 163 *N.J.* 235, 237, 748 *A.2d* 558 (2000) (custody dispute between father and deceased mother's parents).

---

[8] The United States Supreme Court is considering a constitutional challenge to Washington's grandparent visitation statute. *See Troxel v. Granville,* No. 99–138, 2000 *WL* 41235 (U.S.2000). It is unclear what, if any, effect the opinion in that case will have on New Jersey's statute because the Washington statute applies to "any person" and does not contain standards to guide trial courts in the application of the best interests test. *See Wash. Rev.Code* § 26.10.160(3) (1977) (amended by *Wash. Rev.Code* § 26.09.240 (1996)).

In this case, the parties are parents and grandparents, and the sole issue is visitation by biological grandparents after a child has been adopted by non-relatives. Our inquiry should focus, therefore, on the governmental interest in the grandparent-grandchild relationship and the degree of intrusion on the adoptive parents' right to family autonomy, *i.e.*, to decide who should be allowed to visit their child.

New Jersey has long recognized that it is important for children to develop and maintain a connection with family members other than parents. Our Court has declared that grandparents in particular can provide children with "unconditional love and acceptance, which complements rather than conflicts with the role of ... parents." *Mimkon, supra,* 66 *N.J.* at 436, 332 *A.*2d 199. It has been demonstrated that children benefit from a relationship with their grandparents in a variety of ways, and that such relationships offer security as well as familial and cultural pride. Peter A. Zablotsky, *To Grandmother's House We Go: Grandparent Visitation After Stepparent Adoption,* 32 *Wayne L.Rev.* 1, 46 (1985). Peter Zablotsky's description of the advantages of grandparent-grandchild interaction is compelling:

Sociological literature has documented and analyzed the benefits children receive from a healthy relationship with their grandparents. Contact with grandparents produces children who are rooted in and proud of their family and culture, emotionally secure, and highly socialized. Additionally, interaction between grandparents and grandchildren mitigates ageism in children because older people love them, mitigates sexism because grandmothers and grandfathers do essentially the same thing, and eliminates fear of old age because grandparents serve as ancestor role models. Finally, grandparents can give grandchildren "an emotional sanctuary from the everyday world." These findings are consistent with those of other experts on child development, who generally agree that it is important for children to maintain ongoing meaningful relationships.

[*Ibid.*]

In New Jersey, six percent of children under eighteen, 107,287 children, live in grandparent-headed households. *See* New Jersey State Legislature Assembly Task Force on Grandparenting, *Report of Findings and Recommendations,* 1 (Jan.2000). As demographics change and family configurations evolve, state legislatures and courts have increasingly embraced a larger concept of

family autonomy extending beyond nuclear families. *See Moore, supra*, 431 *U.S.* at 505, 97 *S.Ct.* at 1938, 52 *L.Ed.* 2d at 541 ("[T]he accumulated wisdom of civilization, gained over the centuries and honored throughout our history . . . supports a larger conception of family."). Indeed, the trend toward recognizing extended family relationships is nationwide in scope; all fifty states have passed statutes that allow grandparents some form of visitation,[9] although all of these statutes have not been sustained by the courts. *See supra* at 194–95, 748 *A.2d* at 535–36. This trend does, however, demonstrate broad recognition of the role of extended families in our society; it also acknowledges the benefit that children derive from nurturing relationships with relatives other than parents and, specifically, with grandparents and siblings. In my view,

<hr>

[9] *Ala.Code* § 30–3–4 (West 1990); *Alaska Stat.* § 25.20.065 (Lexis 1998); *Ariz. Rev.Stat.* § 25–409 (Supp.1999); *Ark.Code Ann.* § 9–13–103 (Michie 1993); *Cal. Fam.Code* §§ 3102–3104 (West 1994); *Colo.Rev.Stat.* §§ 19–1–117 to –117.5 (Supp.1996); *Conn. Gen.Stat.* § 46b–59 (1995); *Del.Code Ann.* tit 10, § 1031(7) (1999); *Fla. Stat.* ch. 752.001–752.07 (1997); *Ga.Code Ann.* § 19–7–3 (1999); *Haw.Rev.Stat.* § 571–46.3 (1999); *Idaho Code* § 32–719 (1996); 750 *Ill. Comp. Stat.* ⅚₀₇ (West 1999); *Ind.Code* §§ 31–17–5–1 to –10 (1997); *Iowa Code* § 598.35 (Supp.1999); *Kan. Stat. Ann.* § 38–129 (1993); *Ky.Rev.Stat. Ann.* § 405.021 (Michie 1999); *La.Rev.Stat. Ann.* § 9:344 (West Supp.1999); *Me.Rev.Stat. Ann.* tit. 19–A, §§ 1801–1805 (West 1998); *Md.Code Ann., Fam. Law* § 9–102 (1999); *Mass. Gen. Laws* ch. 119, § 39D (Supp.1999); *Mich. Comp. Laws* § 25.312(7b) (Supp.1999); *Minn.Stat.* § 257.022 (1998); *Miss.Code Ann.* §§ 93–16–1 to –7 (1999); *Mo.Rev.Stat.* § 452.402 (Supp.2000); *Mont.Code Ann.* § 40–9–102 (1999); *Neb.Rev.Stat.* §§ 43–1801 to –1803 (1998); Act of May 13, 1999, L. 1999, c. 113, § 1, 1999 Nev. Sess. Law (effective Oct. 1, 1999); *N.H.Rev.Stat. Ann.* § 458:17–d (1992); *N.M. Stat. Ann.* §§ 40–9–1 to –4 (Michie 1994); *N.Y. Dom. Rel. Law* § 72 (McKinney 1999); *N.C. Gen.Stat.* § 50–13.2 (1999); *N.D. Cent. Code* § 14–09–05.1 (1997); *Ohio Rev.Code Ann.* §§ 3109.11–3109.12 (Anderson Supp.1998); *Okla. Stat. Ann.* tit. 10, § 5 (West 1998); Act of July 6, 1999, L. 1999, c. 477, § 1, 1999 Or. Sess. Law; *Or.Rev.Stat.* §§ 109.123, 109.332 (1998); 23 *Pa. Cons.Stat. Ann.* §§ 5311–5314 (West Supp.1999); *R.I. Gen. Laws* §§ 15–5–24.1 to –24.3 (Supp.1999); *S.C.Code Ann.* § 20–7–420(33) (Law.Co-op.Supp. 1999); *S.D. Codified Laws* §§ 25–4–52 to –54 (Michie 1999); *Tenn.Code Ann.* §§ 36–6–302, –306, –307 (Supp.1999); *Tex. Fam.Code Ann.* § 153.433 (West Supp.2000); *Utah Code Ann.* § 30–5–2 (1998); *Vt. Stat. Ann.* tit. 15, §§ 1011, 1016 (1989); *Va.Code Ann.* §§ 20–124.1 to –124.3 (Michie Supp.1999); *Wash. Rev.Code* § 26.09.240(3) (1999); *W. Va.Code* §§ 48–2B–1 to –12 (1999); *Wis. Stat.* §§ 880.155, 767.245 (1991); *Wyo. Stat. Ann.* § 20–7–101 (Lexis 1999).

there is ample support for the states' strong interest in encouraging those relationships.

In respect of the impact of the Grandparent Visitation Statute, I would find that the statute permits only a limited intrusion, if any, on parents' constitutionally protected interests. The statute is not about the termination of parental rights, or about who should have physical custody of the child; it is about *whether* and *under what circumstances* visitation should occur. *Cf. Zack v. Fiebert,* 235 *N.J.Super.* 424, 426, 563 *A.*2d 58 (App.Div.1989). New Jersey is one of fourteen states that provide detailed standards for determining an application for visitation. The trial court is required to consider eight factors bearing largely on various relationships within the family and their duration and quality. *N.J.S.A.* 9:2–7.1(b)(1)–(8); *see supra* at 164, 748 *A.*2d at 518. Also, visitation may not be awarded unless the "applicant [ ] prove[s] by a preponderance of the evidence that the granting of visitation is in the best interests of the child." *N.J.S.A.* 9:2–7.1(a). The best interests benchmark is, therefore, circumscribed by the multiple-factor test, which guides but does not limit judicial discretion in making these sensitive determinations. *See N.J.S.A.* 9:2–7.1(b). Unlike other state visitation statutes that extend standing to any person, New Jersey's statute is limited to blood relationships that the Legislature has determined have special importance, *i.e.,* grandparents and siblings. Under our statute, only a grandparent who has a significant relationship with a grandchild would make it past the first step of the test, and only if the application has been filed in good faith. *See N.J.S.A.* 9:2–7.1(b)(1), (3), and (6).

I also interpret *N.J.S.A.* 9:2–7.1(b)(4) to require that grandparent visitation cannot threaten the stability of the parent-child relationship in any way. If a court determined that a grandparent posed any threat or any risk of a threat to the child's relationship with his or her parents, *N.J.S.A.* 9:2–7.1(b)(7), the petition for visitation would be summarily dismissed. In my view, the statute mandates that courts give deference to parents' objections to

visitation and to their beliefs concerning the best interests of their child. *See N.J.S.A.* 9:2–7.1(b)(2), (4). If visitation is permitted, it can be conditioned on safeguards to protect the interests of parents, including supervised visits and other restrictions. Only when a grandparent has acted *in loco parentis* to a grandchild should there be a presumption in favor of visitation. *N.J.S.A.* 9:2–7.1(c).

Like most such statutes, the Grandparent Visitation Statute does not provide a right *to* visitation, only standing to petition the court *for* visitation. *See N.J.S.A.* 9:2–7.1(a). When a petition cannot support visitation, as in a case where the applicant is unfit, or where the child has been adopted as an infant and there has been little or no contact with the grandparents, the court should dismiss the petition forthwith. *Cf. R.* 5:8–6 (providing for a custody hearing only if the court finds that there is a "genuine and substantial issue"). I expect that the family courts would quickly recognize insubstantial pleadings and that visitation petitions would only be filed when there is merit to the petitioner's claim.

The result in each case is dependent on the facts in each case. If warranted under the statutory standards, I believe that the limited intrusion effected by grandparent visitation is constitutionally permissible. I observe that here, V was not adopted by a non-relative family shortly after birth, and that the child has had ongoing contact with her grandparents for five years. The California Supreme Court has explained that in such circumstances,

> the law should not and cannot ignore the fact that an adopted person may not in many respects be cut off from his natural family. If affection and regard remains between members of a natural family, the law should not in the name of consistency undertake to thwart the expression of those feelings when the encouragement thereof does not hinder the adoptive relationships.
>
> [*In re Estate of Zook v. Zook,* 62 Cal.2d 492, 42 Cal.Rptr. 597, 399 P.2d 53, 56 (1965) (en banc) ].

I would remand this case to the trial court for findings based on the statutory standards. I would require the court to consider, among other factors, whether visitation would unduly interfere with the manner in which the adoptive parents have chosen to

raise V, the nature of their objections to visitation (including their concerns about V's father), whether the adoptive parents previously consented to visitation, and the scope of visitation sought. I believe that the trial court should decide whether it would be in V's best interests to permit visitation with her biological grandparents despite the countervailing concerns expressed by her adoptive parents.

## VI

For all of the reasons I have expressed, I respectfully dissent from the majority opinion.

Justice STEIN join in PORITZ's, C.J., opinion.

*For vacating and reversal*—Justices O'HERN, GARIBALDI, COLEMAN, LONG and VERNIERO—5.

*For affirmance and remandment*—Chief Justice PORITZ and Justice STEIN—2.