# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4590-18T1
 A-4591-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.T. and A.M., SR.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.M.,
JR., and A.R.M.,

     Minors.

_____

Submitted May 6, 2020 – Decided June 5, 2020

Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0019-19.

Joseph E. Krakora, Public Defender, attorney for appellant A.T. (Robyn A. Veasey, Deputy Public Defender, of counsel; Catherine F. Reid, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.M., SR. (Robyn A. Veasey, Deputy Public Defender, of counsel; Meghan K. Gulczynski, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph Krakora, Public Defender, Law Guardian, attorney for minor G.D. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

In this consolidated matter, defendants A.T.[1] (Amelia) and A.M., Sr. (Avery, Sr.) appeal from the June 18, 2019 judgment terminating their parental rights to their biological children, A.M., Jr. (Avery, Jr.), born in January 2012 and A.R.M. (Alex), born in December 2016. The Division of Child Protection and Permanency (Division) first became involved with the family in July 2016. The children were removed from the defendants' care about a year later. After

---

[1]  We use initials and pseudonyms to preserve the privacy of the parties. R. 1:38-3(d)(12).

three years of unresolved substance abuse, mental health, employment, and housing issues, the court found that the Division proved that termination of parental rights was in the best interests of the children. The Law Guardian urges affirmance, and after a thorough review of the facts in light of the pertinent law, we affirm.

## I. Factual Background.

The evidence presented at trial revealed the following facts. The Division first became involved with defendants in July 2016 when it received an anonymous referral that a pregnant Amelia was "snorting Percocet pills that were obtained illegally." During the Division's July 18, 2016 interview of defendants at their home, which they shared with their then four-year-old son, Avery, Jr. and Amelia's mother, G.M.T. (Gina), Avery, Sr. revealed he had been prescribed Percocet. Gina, who, according to the Division, was "very coherent" despite her schizophrenia, denied having any concerns about defendants' parenting. Amelia was told to complete a urine screen.

Later that day, Amelia called the Division and admitted she was abusing Percocet and needed help. Amelia tested positive for opiates. A safety protection plan (SPP) was implemented for a month, during which Avery, Sr.

A-4590-18T1

was approved to supervise Amelia with Avery, Jr. The Center for Family Services (CFS) recommended an intensive out-patient program (IOP).

Amelia began her IOP in September 2016, but after attending two group sessions, she did not return to treatment and was officially discharged from the program in November. She agreed to random drug testing the following month but failed to comply.

After his birth the following month, Alex tested positive for oxycodone and suffered withdrawal symptoms. Alex was discharged to his parents at the beginning of January 2017, with an SPP again in place requiring that Amelia's contact with her children be supervised by Avery, Sr. or her grandmother, G.A.T. (Gail). The SPP was lifted later in the month.

Two months later, the court granted Gail joint custody of both children and designated her as the parent of primary residence. Amelia and Avery, Sr. had been living with his mother, L.W. (Lisa). Defendants were granted "open and liberal parenting time as agreed." This order was modified at the beginning of May 2017 to forbid Amelia from exercising unsupervised time with the children if she had used drugs within twenty-four hours of the visit.

The following month, the Division received another referral alleging that Avery, Sr. was abusing heroin and morphine. He claimed he was only taking

A-4590-18T1

his prescribed oxycodone as directed. At this time, Avery, Sr. was living with Lisa, while Amelia and the children lived with Gail.

At the end of June 2017, the Division received its next referral from the Monroe Township police, reporting that Amelia overdosed on heroin in the presence of then six-month-old Alex while she was at Lisa's house. The police reported that "[f]ive full bags of heroin, paraphernalia/contraband and several prescription[] bottles with [Gail's] name," were found in the room. Although Gail denied that Amelia took Gail's medication, she noted her pills "occasionally" went missing. Thirty-two pills were missing from Gail's oxycodone prescription bottle. A Dodd removal[2] of Avery, Jr. from Gail's home was facilitated.

Later, Amelia, Avery, Sr. and Alex were found on the street by a police officer. The Division worker went to the scene and observed that defendants appeared to be "under the influence." Avery, Sr. was "falling/rocking into the stroller where [Alex] [was] located." When the Division confronted Amelia about her overdose that morning, she denied the allegation and stated nothing

---

[2] A "Dodd removal" is the emergency removal of a child from a home without a court order, pursuant to the Dodd Act, N.J.S.A. 9.6-8.21 to -8.82.

happened. Alex was also emergently removed due to defendants' "substance use and their inability to keep him safe while in their care."

The police reported that later that day, Avery, Sr. was arrested for being under the influence and drugs were found on him. Two days later, the Division obtained custody of both boys and defendants were allowed Division-supervised visits only.

The following month, Amelia admitted to using heroin and stealing Gail's pills. Avery, Sr. continued to deny any substance abuse and stated he was not under the influence. Defendants refused to submit to numerous unscheduled drug tests.

Psychologist Dr. Janet Cahill, Ph.D., concluded that Gail "had significant deficits in cognition, memory and adaptive skills and was not able [to] safely parent [Avery, Jr.] and [Alex] on her own." Dr. Cahill noted that because Amelia admitted to substance abuse and tested positive for benzodiazepines and opioids, her visitation with the children should remain supervised and she should continue to comply with random drug testing and enter a detox program. As to Avery, Sr., Dr. Cahill found him to be "very guarded and defensive," noting that he refused to cooperate with random drug testing. She suggested that in addition to supervised visitations and compliance with random drug tests, "he should be

referred for short term motivational interviewing to attempt to improve his insight and willingness to sincerely engage in other services."

In October 2017 Amelia again tested positive for benzodiazepines and opioids, as well as Suboxone. Avery, Sr. "nodded off" several times during his drug evaluation and tested positive for heroin and marijuana. A short-term "clinically managed high-intensity residential" treatment program was recommended for both Amelia and Avery, Sr.

A fact-finding hearing was held on November 15, 2017, where the court heard testimony from two Division caseworkers and found the Division had not demonstrated that defendants abused or neglected their children but were "part of a family in need of services." The court continued to order defendants and Gail to comply with evaluations and submit to random drug and hair follicle testing. Defendants were allowed weekly supervised visits with their children. In December 2017, Amelia revealed to the Division that she and Avery, Sr. separated because "if they stayed together each one would probably still do drugs."

Avery, Sr. entered a substance abuse program in December 2017, but was discharged six days later. In January 2018, Amelia was admitted into a detox program. Upon her completion, she entered into an IOP.

7

Defendants again missed several unscheduled substance abuse evaluations, but when they did attend, they often tested positive for various drugs. Defendants also had difficulty complying with their drug rehabilitation programs.

In April 2019, Dr. Melanie A. Freedman, Ph.D., performed psychological and bonding evaluations of defendants with their children. As to Amelia, Dr. Freedman noted that "there is some attachment between [Amelia] and [Avery, Jr.], [but] some parenting-related risks still remain, such as a high relapse potential and lack of stable housing." Similarly, Dr. Freedman found that although Avery, Sr. clearly loved his children, "his poor insight regarding his need for any services and his past problems with compliance, including his recent failure to undergo drug testing when explicitly requested to do so, suggest a poor prognosis for reunification." Dr. Freedman supported termination of parental rights.

Defense psychologist Dr. Andrew P. Brown III, Ph.D. found that Avery, Sr. had "significant issues revolving around lack of stability, support and narcotic use," therefore failing to "demonstrate readiness to be a minimally adequate parent/caregiver to his children." He opined, however, that despite Avery, Jr.'s "secure attachment to the resource parents, [because] [Avery, Sr.]

has remained as the central figure of emotional attachment in [his] life. . . . [t]ermination of parental rights followed by severed contact will do more psychological harm than good." Dr. Brown suggested the court "consider an alternative arrangement to termination of parental rights that would insure [Avery, Jr.] the freedom and capacity to continue contact with his natural father." Dr. Brown did not suggest a practical alternative to termination, given that New Jersey does not recognize open adoptions, where biological parents retain visitation rights after adoption. In re Adoption of a Child by W.P., 163 N.J. 158, 172 (2000). Defendants did not testify.

Amelia presents the following arguments on appeal:

> POINT I: DEPRIVATION OF A FUNDAMENTAL CONSTITUTIONAL RIGHT SHOULD NOT BE AFFIRMED WHERE THE FAMILY PART OPINION IS AMBIGUOUS AND INCOMPLETE, FAILING TO COMPLY WITH R. 1:7-4; AND WHERE THE JUDGE CONDUCTED THE PROCEEDINGS IN A MANNER THAT VIOLATED THE PARENTS' DUE PROCESS RIGHTS.
>
> A. THE FAMILY PART FAILED TO MAKE CLEAR FINDINGS OF FACT ON CRITICAL ISSUES AND FAILED TO CORRELATE ITS FINDINGS OF FACT TO THE NECESSARY LEGAL CONCLUSIONS AS TO THE FOURTH PRONG OF N.J.S.A. 30:4C-15.1A.
>
> B. THE FAMILY PART FAILED TO MAKE ANY LEGAL CONCLUSIONS AT ALL AS TO EITHER

PART OF THE THIRD PRONG OF N.J.S.A. 30:4C-15.1A.

C. THE FAMILY PART CONDUCTED THE PROCEEDINGS IN SUCH A WAY THAT THE PARENTS WERE DENIED DUE PROCESS.

POINT II: THE TRIAL COURT'S LEGAL CONCLUSIONS AS TO N.J.S.A. 30:4C-15 WERE NOT SUPPORTED BY SUFFICIENT, COMPETENT EVIDENCE.

A. THE "FACTS" FOUND BY THE TRIAL COURT TO SUPPORT ITS LEGAL CONCLUSIONS AS TO THE FIRST PRONG OF N.J.S.A. 30:4C-15.1A WERE LARGELY BASED ON HEARSAY.

B. EVEN IF THE EVIDENCE ON WHICH THE JUDGE RELIED TO FIND THE FIRST PRONG SATISFIED HAD BEEN COMPETENT, IT DID NOT DEMONSTRATE PHYSICAL, EMOTIONAL OR PSYCHOLOGICAL HARM TO THE CHILDREN. NOR WAS THERE CLEAR AND CONVINCING EVIDENCE IN THE RECORD THAT THE CHILDREN WERE HARMED BY THEIR STAY IN FOSTER CARE.

C. THE TRIAL COURT ERRED IN CONCLUDING THAT THE SECOND PRONG OF N.J.S.A. 30:4C-15.1A WAS SATISFIED AT A CLEAR AND CONVINCING LEVEL OF PROOF WHERE THE RECORD SHOWED THAT A.T. COULD CEASE HARMING THE CHILDREN AND IT WAS REASONABLY FORESEEABLE SHE WOULD BE ABLE TO PARENT THEM IN THE FUTURE.

D. THE JUDGMENT CANNOT BE AFFIRMED BECAUSE THE FAMILY PART OMITTED THE

10

REQUIRED CONSIDERATION OF ALTERNATIVES TO TERMINATION, AND DCPP DID NOT PRESENT A RECORD ON WHICH THE OMITTED LEGAL CONCLUSION COULD BE COMPETENTLY BASED.

E. THE TRIAL COURT ERRED IN CONCLUDING THAT THE FOURTH PRONG OF N.J.S.A. 30:4C-15.1A WAS SATISFIED AT A CLEAR AND CONVINCING LEVEL OF PROOF WHERE THE RECORD DID NOT CONTAIN COMPETENT EVIDENCE THAT TERMINATION OF PARENTAL RIGHTS WOULD RESULT IN A PERMANENT HOME FOR THE BOYS AND THE BONDING EVIDENCE WAS MIXED AND AMBIGUOUS.

Avery, Sr., presents the following arguments on appeal:

POINT I: THE COURT ERRED WHEN IT RELIED UPON HEARSAY EVIDENCE TO CONCLUDE THE FATHER HARMED HIS CHILDREN.

POINT II: THE COURT MISSTATED THE EVIDENCE AND ERRED IN FINDING THE FATHER DID NOT MAKE EFFORTS TO ADDRESS HIS SUBSTANCE USE DISORDER.

POINT III: THE TRIAL COURT FAILED TO MAKE ADEQUATE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN ITS DECISION AS TO PRONG THREE OF THE BEST INTEREST TEST UNDER N.J.S.A. 30:4C-15.1A(3).

POINT IV: DCPP FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD AND THE COURT FAILED TO ACCURATELY ARTICULATE

11

PRONG FOUR AND CONSIDER IT IN LIGHT OF THE FATHER'S STRONG BOND WITH HIS SON, BUT INSTEAD RELIED UPON DCPP'S EXPERT WHO DEMONSTRATED A BIAS WHEN SHE REFUSED TO RELY UPON EMPIRICAL EVIDENCE.

## II. Our Standard of Review.

Our review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). We must determine whether the decision is "supported by 'substantial and credible evidence' on the record." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

We defer to the family court's factual findings, because that court "has the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." Ibid. Ultimately, a family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). The court's interpretation of the law or its legal conclusions are reviewed de novo. State ex rel. A.B., 219 N.J. 542, 554-55 (2014); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Parents have a constitutionally protected right to the care, custody, and control of their children. F.M., 211 N.J. at 447. That right, however, is not absolute. Ibid. At times, a parent's interests must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009). "Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

To address such concerns, the Legislature created the best interests test for determining whether a parent's rights must be terminated. N.J.S.A. 30:4C-15.1(a) requires that the Division prove all four prongs by clear and convincing evidence. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 378 (App. Div. 2018). The four prongs are not independent of one another. Id. at 379. Rather, they "are interrelated and overlapping" and "designed to identify and assess what may be necessary to promote and protect the best interests of the child." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006).

### III. Prong One.

To satisfy the first prong of the best interests test, the Division must prove by clear and convicting evidence that "the child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1).

### A.  Hearsay Evidence.

Both parents object to the hearsay nature of some of the evidence.  "[A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is inadmissible, unless an exception applies.  N.J.R.E. 801(c); N.J.R.E. 803.

Division reports are generally admissible under the N.J.R.E. 803(c)(6) business record exception to hearsay.  N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 495 (App. Div. 2016).  Because "requiring all [Division] personnel having contact with a particular case to give live testimony on all the matters within their personal knowledge would cause an intolerable disruption . . . . it becomes necessary to allow certain evidence to be produced in a hearsay form."  Id. at 496 (alteration in original) (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)).  Therefore, statements to the report's author "by Division 'staff personnel (or affiliated medical,

psychiatric, or psychological consultants), [made based on] their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the' Division" are admissible.  Ibid. (alteration in original) (quoting Cope, 106 N.J. at 343).

However, "written reports from neighbors, the police or other persons," are governed by the usual hearsay rules.  Ibid. (quoting Cope, 106 N.J. at 344).  "[E]ven if a document 'is admissible as a record of regularly conducted activity,' statements by others reported by the author of the document 'are "hearsay-within-hearsay," each level of which . . . requires a separate basis for admission into evidence.'"  Id. at 497 (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 375 n. 1 (2010)).

Amelia argues that, in rendering its decision under prong one, the court relied primarily on hearsay in the Division's records.  Reports and testimony from the doctor who conducted the psychological evaluation are permissible forms of hearsay under the business records exception.  Dr. Freedman testified that Amelia "acknowledge[d] at the time that seven-month-old [Alex] was in the room with her when [her overdose] occurred."

Avery, Sr. asserts that the information from his June 2017 arrest contained in the Division's report was inadmissible hearsay because neither the reporting

officer testified nor was a police report from the incident admitted into evidence. Because neither defendant objected to the arrest testimony, Avery, Sr.'s argument must be reviewed for plain error. R. 2:10-2. He carries the burden of demonstrating that this error was "of such a nature as to have been clearly capable of producing an unjust result," and therefore, should not be disregarded by this court. Ibid. Had an objection been made, the Division could easily have obtained and introduced the police reports.

The decision to terminate parental rights focuses on "the effect of harms arising from the parent-child relationship over time on the child's health and development." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Avery Sr.'s repeated failure to comply with his evaluations and rehabilitative programs was discussed at length by the court. Avery, Sr.'s substance abuse history and the recommendations of Dr. Cahill and Dr. Brown supported the conclusion that prong one was satisfied.

### B.  Evidence of Drug Use.

Amelia argues that the Division did not establish that the children were harmed by her overdose and their subsequent removal. The Division must establish under the first prong "that the health, safety, and development of a child has been or would continue to be endangered if a relationship with the

16

parents were allowed to continue." T.D., 454 N.J. Super. at 380. "[A] parent's inability to provide care is harmful and can endanger the health of a child." Ibid. The "best interests standard does not concentrate on a single or isolated harm or past harm as such. Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Drug use during pregnancy constitutes harm to the child "when that drug use results in the child being born addicted to drugs with the attendant suffering caused by such addiction." Id. at 349-50. Our Supreme Court has stated that "the attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 613 (1986)). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid.

Alex suffered withdrawal symptoms at birth as a result of Amelia using drugs while pregnant. Amelia admitted during her psychological evaluation with Dr. Freedman that she used heroin on the night in question and was

awakened by paramedics. Amelia classified it as a "suspected overdose" because Narcan was not used, however, she was found unconscious, pale and with blue lips. Evidence that she overdosed when caring for her infant son is supported by substantial credible evidence in the record.

Amelia's drug use caused the removal of her children. Both parents continued to use drugs despite the Division's attempts to help. The court properly found that the Division proved by clear and convincing evidence that the children's "safety, health or development has been or will continue to be endangered by the parental relationship."

## IV. Prong Two.

The second prong under N.J.S.A. 30:4C-15.1(a)(2) requires the court to determine whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." The court "is permitted to consider whether the parents would correct their conduct within the reasonably foreseeable future." T.D., 454 N.J. Super. at 380.

## A. Amelia.

Amelia asserts that the court improperly relied on the fact that she was in the early stages of recovery and acknowledged that "she still had work to do

A-4590-18T1

before she could independently parent her children." Amelia notes that she has not used substances since February 2019 and, pending the Division's inspection, secured a home for her sons. Amelia argues that the record supports a finding that she "had progressed in her rehabilitation to the point that she was 'able to remove the danger' facing her children."

The record, however, does not demonstrate that she will be able to parent the children in the foreseeable future. Although Amelia made more progress than Avery, Sr., she acknowledges that she is not yet able to care for her children.

## B. Avery, Sr.

Based upon the Division's reports and the expert testimony, overwhelming evidence was presented to establish Avery, Sr.'s continued substance abuse would be harmful to the children. Avery, Sr. stresses that he participated in detox programs prior to the start of the guardianship litigation, between November and December 2017.

He tested positive for fentanyl in April 2019. The Division's June 2019 substance abuse evaluation reported that he tested positive for fentanyl on the following dates: November 20, 23; December 14 and 24, 2018, and April 23, 2019. Avery, Sr. was clearly not able to remediate his drug use. The history of

19

failed drug tests and substance abuse treatment programs shows that Amelia and Avery, Sr. have been unwilling or unable to eliminate the harm facing their children or to provide a safe home.

### V. Prong Three.

The Division must prove under prong three that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

The court discussed on the record its factual findings regarding the services provided by the Division to Amelia and Avery, Sr., beginning in 2016 with a SPP. The court reviewed the timeline of events that led to Amelia and Avery, Sr. being referred to substance abuse evaluations, psychological evaluations, urine screens, supervised visitation, short-term counseling, substance abuse inpatient treatment programs, short-term residential programs, detox programs, and hair follicle testing.

Following the discussion of the services provided to defendants, the court noted that its findings related to prongs one and two, as well as to "the Division's

reasonable efforts." The Division made many efforts to rehabilitate the parents during its three-year involvement with this family.

The Division assessed alternative placements for the children and ruled out several relatives, including the maternal aunt, whose family was not interested in being a caregiver, Lisa, who failed to complete the background check, as well as Gina and Gail. Gina was ruled out due to her criminal history and mental health history. Gail was ruled out based on her substance abuse and the results of psychological evaluations following the removal of the children. Amelia and Avery, Sr. offered no other alternatives to termination.

## VI. Prong Four.

Prong four of the best interests test, that "[t]ermination of parental rights will not do more harm than good," N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." E.P., 196 N.J. at 108 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007)). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interests will best be served by completely terminating the child's relationship with that parent." Ibid. "Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction." N.J. Div. of

21

Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 264 (App. Div. 2005) (quoting In Re Guardianship of J.E.D., 217 N.J. Super. 1, 15-16 (App. Div. 1987)).

"It also is widely understood that a 'child deeply needs association with a nurturing adult' and that 'permanence in itself is an important part of that nurture.'" E.P., 196 N.J. at 108. (quoting A.W., 103 N.J. at 610). N.J.S.A. 30:4C-15.1(a)(4) is deemed satisfied "where it is shown that the bond with [resource] parents is strong and, in comparison, the bond with the natural parent is not as strong." K.H.O., 161 N.J. at 363.

The Division "should offer testimony of a 'well-qualified expert who has had [the] full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the [resource] parents." M.M., 189 N.J. at 281 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). If contrasting expert opinions are presented, "[t]he court has a responsibility, albeit difficult, to make sense of the competing views presented by the experts and to sift the attitudes of all witnesses. Because the welfare of a child is the central concern, it is important that courts thoroughly inform themselves of the subject matter." J.C., 129 N.J. at 22.

The court discussed in detail the experts' opinions as to the children's bonds with their biological parents as well as their resource parents. The court found that the experts agreed that Avery, Jr. has a "strong affectionate bond" with Avery, Sr. and "a positive bond" with Amelia that is "not quite as strong" as with Avery, Sr. The experts did not dispute that despite Avery, Sr.'s bond with his children, he failed to demonstrate his ability to parent. As for Alex, the experts concluded that he did not have a strong bond with either parent.

The experts "opined that the [resource] parents have a secure bond with the children." The Division records, admissible as previously discussed pursuant to N.J.R.E. 803(c)(6), reflect that the resource parents wished to adopt the two boys. The court noted that defendants' expert referred to the resource parents as "psychological parents," who the court described as "the folks that the children know will provide for them and keep them safe on a day-to-day basis." While the court acknowledged that the experts had different theories about how termination would affect the children, the court found both experts to be highly qualified, competent and credible.

The family court has the authority to make fact and credibility findings and we defer to those findings, unless the decision was unsupported by substantial and credible evidence. F.M., 211 N.J. at 448. The court focused on

the children's need for a stable home, their "need to know where they're growing up." With neither parent capable of parenting the children, and with permanency desperately needed, termination of parental rights and adoption by the resource parents was clearly in the children's best interests.

## VII. Due Process Claim.

Amelia challenges the court's decision to proceed with closing arguments, without objection, on the final day of testimony after the court excused defendants from listening to the remainder of cross-examination due to a doctor's appointment, and after advising them that closing arguments would be presented on another day. She certainly had access to a transcript of the proceedings and offers no reason why the presentation of closing arguments in her absence violated her due process rights. Her argument is without sufficient merit to require further discussion in a written opinion. R. 2:11-3(e)(1)(E).

In this unfortunate family situation, the Division presented substantial credible evidence to support the family court's finding by clear and convincing evidence that termination of parental rights was in the best interests of the children. No "injustice" requires our intervention. See F.M., 211 N.J. at 448.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4590-18T1